IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

    Plaintiff,

v.

RODOLFO LOPEZ (01) and
JUAN R. TORRES-ARAMBULA (02),

    Defendants.

Case No. 15-40001-DDC

**MEMORANDUM AND ORDER**

Defendants Rodolfo Lopez and Juan R. Torres-Arambula filed this joint motion (Doc. 32) seeking to suppress evidence of 33 packages of methamphetamine and cocaine that police discovered after searching the car they were driving. The Court held a hearing on defendants' motion on June 22, 2015. After considering the arguments and evidence that the parties have presented, the Court denies defendants' motion.

**I. Facts**

The Court takes the following facts from the parties' briefs and the evidence presented at the June 22 hearing, including a video of the traffic stop and subsequent search taken by a dashboard camera ("dashcam") mounted in the arresting trooper's patrol car.

On January 8, 2015, Kansas Highway Patrol Trooper Jarrett Ranieri was on duty in his marked police cruiser on Interstate 70 near mile marker 322 in Wabaunsee County, Kansas. Trooper Ranieri was participating in a "ruse drug lane" operation. Officers had posted a sign on the highway indicating that a drug check lane with drug detection dogs was operating on the highway. In reality, no checkpoint existed, and Trooper Ranieri was watching for vehicles

1

attempting to evade the purported checkpoint. At about 12:34 a.m., he observed a silver car take Exit 322 off of I-70 onto Tallgrass Road, the first available exit after passing the checkpoint signs. Tallgrass Road near Exit 322 is an unlighted dirt road that has no businesses or services located on it.

Trooper Ranieri observed that the silver car failed to come to a complete stop at the stop sign at the bottom of the exit ramp, a violation of K.S.A. § 8-1528. Trooper Ranieri thus turned on his emergency lights to stop the silver car. It made a u-turn on Tallgrass Road and came to a stop. Trooper Ranieri pulled his patrol vehicle in front of the car. He determined it was a 2007 Toyota Camry bearing Kansas temporary 60-day registration tags. Trooper Ranieri got out of his police cruiser and approached the driver's side of the Camry. When he arrived at the window, he saw that one driver and one passenger occupied the front seat. Trooper Ranieri later determined that Mr. Lopez was the driver and that Mr. Torres-Arambula was the passenger.

Trooper Ranieri told Mr. Lopez why he had stopped the car and asked for his driver's license. Trooper Ranieri also asked where defendants were coming from and where they were going. Defendants said that they had been to Albuquerque and were headed to Kansas City, Kansas. Trooper Ranieri requested proof of car insurance and asked who owned the car. Mr. Lopez handed over proof of insurance and said that the Camry was a friend's car. Defendants said that the friend, whom they did not identify, let them borrow the car because they had agreed to drive the friend's niece to Albuquerque. Trooper Ranieri then asked to see Mr. Torres-Arambula's driver's license, and Mr. Torres-Arambula handed it to him.

Trooper Ranieri asked defendants why they had taken the Tallgrass Road exit. Defendants said that they were looking for a gas station. Trooper Ranieri looked at the fuel gauge and saw that it showed that the Camry had about a quarter tank of gas left. During this

2

initial conversation, Trooper Ranieri smelled a strong odor of air freshener in the car. He also noticed that the center console was overflowing with burned cigarettes, that the car was filled with fast food and other food wrappers, and that there appeared to be very little luggage. Trooper Ranieri then told defendants that he was going to check their licenses, and he returned to his patrol vehicle. The initial conversation with defendants lasted about two minutes.

Trooper Ranieri moved his patrol car behind defendants' Camry. He then radioed dispatch and asked the operator to run a check on defendants' licenses. At this point, Trooper David Stahl arrived on the scene as back-up, parked in front of the Camry, and approached Trooper Ranieri's police cruiser. After about eight minutes, dispatch radioed back to Trooper Ranieri's cruiser. Over the course of three minutes or so, the operator relayed background information about Mr. Lopez and Mr. Torres-Arambula. Among other things, the troopers learned that each man had a criminal drug history and that Mr. Torres-Arambula had been charged in 2009 with intent to sell methamphetamine in Kansas City, Kansas. When dispatch finished, the troopers discussed defendants' criminal history, as well as other aspects of the traffic stop, for about three minutes. Then, Trooper Ranieri exited the cruiser, and both troopers walked back to defendants' Camry.

Trooper Ranieri returned defendants' licenses and handed Mr. Lopez a warning citation. Defendants asked him where they would find the closest gas station, and Trooper Ranieri said that they should drive east. Trooper Ranieri then said, "Hey guys, thank you," and both he and Trooper Stahl took a step away from the car. About 20 minutes had elapsed from the time Trooper Ranieri pulled over defendants' car to when he returned their licenses and stepped away.

After taking a step away, Trooper Ranieri turned and asked defendants if they had any guns or illegal drugs in the car. He asked if he could search "the back seat, inside of the car."

Defendants initially expressed a desire to leave, but eventually they stepped out of the car. Both troopers then searched the back seat of the Camry. While doing so, Trooper Ranieri noticed modifications to the underside of the vehicle which led him to believe that it contained a hidden compartment. Specifically, he saw: the heat shield in the exhaust tunnel had undercoating spray on it and had bolts sticking out; the exhaust pipe was bent down in a non-factory position in the exhaust tunnel; and the exhaust muffler had new bolts on it. Trooper Ranieri believed that the compartment he suspected was added to the car might contain illegal drugs. As a result, he told defendants to follow him to the Kansas Department of Transportation facility in Alma, Kansas. There, officers accessed the compartment and discovered 33 packages. Thirty-two of the packages contained methamphetamine. The other one contained cocaine.

On January 14, 2015, a grand jury indicted defendants and charged them with knowing and intentional possession with intent to distribute of more than 500 grams of a mixture and substance containing methamphetamine, in violation of 21 U.S.C. § 841(a)(1).

**II. Analysis**

Defendants argue that the Court should suppress evidence discovered in the Camry for three reasons: (1) Trooper Ranieri unlawfully prolonged the initial stop beyond what was necessary to issue a warning citation; (2) Trooper Ranieri lacked a justification to continue to detain defendants after issuing the warning citation; and (3) the search of the Camry exceeded the scope of consent given by defendants.

As a threshold issue, the government argues that the Court should deny defendants' motion to suppress because they lack standing to challenge the search of a car that neither of them owned. When defendants do not have a "possessory or property interest in the vehicle searched, [they] lack standing to challenge vehicle searches." *United States v. Mosley*, 743 F.3d

1317, 1322 (10th Cir. 2014) (quotation omitted).  But even where a defendant lacks "the requisite possessory or ownership interest in a vehicle to directly challenge a search of that vehicle, the defendant may nonetheless contest the lawfulness of his own detention and seek to suppress evidence found in the vehicle as the fruit of the defendant's illegal detention."  *Id.* at 1322-23 (quotation omitted).  Thus, the Court must determine whether Trooper Ranieri illegally detained defendants.  The Court undertakes this task below.

**A.  Did Trooper Ranieri Unlawfully Prolong the Initial Stop?**

"A traffic stop for a suspected violation of law is a 'seizure' of the occupants of the vehicle and therefore must be conducted in accordance with the Fourth Amendment."  *Heien v. North Carolina*, 135 S. Ct. 530, 536 (2014) (citation omitted).  A traffic stop is justified at its inception if an officer has "an objectively reasonable articulable suspicion that a traffic violation has occurred."  *United States v. Barraza-Martinez,* 364 F. App'x 453, 457 (10th Cir. 2010) (quotation omitted).  K.S.A. § 8-1528 requires a driver to come to a complete stop at stop signs.  Here, Trooper Ranieri stopped defendants' Camry after he saw the car fail to stop completely at the stop sign at the bottom of the Tallgrass Road exit.  He thus had a reasonable articulable suspicion that the driver had violated K.S.A. § 1-528, which justified the traffic stop at its inception.

Defendants wisely do not challenge the validity of the initial stop.  Rather, they argue that Trooper Ranieri prolonged the traffic stop beyond what was necessary to issue a warning citation.  In addition to being justified at its inception, a lawful traffic stop must be "reasonably related in scope to the circumstances which justified the interference in the first place."  *United States v. Marquez-Diaz,* 325 F. App'x 637, 643 (10th Cir. 2009) (quotation omitted) (unpublished opinion).  "A seizure that is justified solely by the interest in issuing a warning

ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005).

The initial stop—all of the time up until Trooper Ranieri handed the warning citation to Mr. Lopez—lasted about 20 minutes. Defendants assert that "an objectively reasonable investigation into the alleged failure to stop at a stop sign would involve a check of [Mr.] Lopez's driver's license and registration, a process easily and quickly accomplished in a few short minutes through the use of the computer in [Trooper] Ranieri's vehicle." Doc. 32 at 4. The Court rejects defendants' argument for two reasons: (1) the length of the initial stop was not unreasonable and (2) in any case, Trooper Ranieri properly had developed reasonable suspicion that defendants were engaged in illegal activity and this justified an extended detention.

### 1. Was the Length of the Initial Traffic Stop Unreasonable?

As noted, a traffic stop to issue a warning citation "can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Caballes*, 543 U.S. at 407. "[T]he touchstone of [this] inquiry is reasonableness." *United States v. Patterson*, 472 F.3d 767, 776 (10th Cir. 2006), *judgment vacated on other grounds*, 555 U.S. 1131 (2009). Courts consider "the individual circumstances that confronted the troopers, using common sense and ordinary human experience to determine whether the police acted less than diligently, or . . . *unnecessarily* prolonged [the] detention." *Id.* (quotation omitted). "A traffic stop does not become unreasonable merely because the officer asks questions unrelated to the initial purpose for the stop, provided that those questions do not unreasonably extend the amount of time that the subject is delayed." *Id.* (quotation omitted).

Here, the detention began when Mr. Lopez, after making a u-turn, came to a stop on Tallgrass Road. Trooper Ranieri pulled his police cruiser in front of the Camry and approached

6

the vehicle. He asked some general questions of defendants for about two minutes, gathered defendants' driver's licenses, and returned to his police cruiser. Trooper Ranieri moved his cruiser behind defendants' Camry, which took about one minute. He then contacted dispatch and, shortly thereafter, called in the defendants' driver's license numbers so that the operator could run a criminal check. Trooper Ranieri and Trooper Stahl, who had walked over to the police cruiser, then talked while waiting to hear back from dispatch. The operator radioed back about eight minutes later. The operator then spent approximately the next three minutes reciting defendants' background information. Both defendants had a criminal history and Mr. Torres-Arambula had been charged with intent to sell methamphetamine. The troopers talked for about three minutes after the dispatch operator finished making her report. Then Trooper Ranieri stepped out of his police cruiser, and both troopers walked back to defendants' car. Trooper Ranieri handed a warning citation to Mr. Lopez, returned defendants' driver's licenses, and then took a step away from the Camry. This concluded the initial stop.

The Court concludes that the length of the detention, about 20 minutes, was not unreasonable. Trooper Ranieri asked a few general questions that did not prolong the stop unreasonably. He then returned to his police vehicle, where he promptly called in defendants' driver's license numbers to run a check. It took dispatch about 12 minutes to run the check and report defendants' criminal history to the troopers. The troopers discussed this information and the stop generally for just three minutes before returning to defendants' Camry. There is little evidence that the troopers "acted less than diligently, or . . . *unnecessarily* prolonged [the] detention." *Id.* (quotation omitted). Thus, the evidence shows that Trooper Ranieri did not extend the scope of the detention beyond what reasonably was necessary to accomplish the initial

7

purpose of the stop. As a result, the Court rejects defendants' argument that the troopers prolonged the initial stop unnecessarily.

### 2. Did the Trooper Ranieri Have Reasonable Suspicion to Extend the Stop?

The Court also concludes that Trooper Ranieri developed reasonable suspicion that defendants were engaged in illegal activity during his initial conversation with them. "The traffic stop may be expanded beyond its original purpose . . . if during the initial stop the detaining officer acquires reasonable suspicion of criminal activity, that is to say the officer must acquire a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Clarkson*, 551 F.3d 1196, 1201 (10th Cir. 2009) (citation omitted). So, even if Trooper Ranieri had prolonged the stop beyond the time necessary to issue a warning citation, the additional detention was justified because, by then, he had developed reasonable suspicion that unlawful activity was afoot.

To determine whether an officer has reasonable suspicion to detain a driver after the purpose of the stop is completed, courts "look to the totality of the circumstances to see whether the officer had a particularized and objective basis for suspecting legal wrongdoing." *Marquez-Diaz*, 325 F. App'x at 644 (quotation omitted). "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might elude an untrained person." *United States v. Santos,* 403 F.3d 1120, 1134 (10th Cir. 2005) (quotations omitted).

Here, Trooper Ranieri saw defendants' Camry take the first available exit after the signs for the ruse drug checkpoint. That exit leads to an unlit gravel road with no services or businesses visible from I-70. After stopping the car, Trooper Ranieri asked defendants why they had decided to exit at Tallgrass Road. They said that they were looking for a gas station.

8

Trooper Ranieri found this explanation implausible for at least three reasons: (1) Tallgrass Road is an unlit gravel road with no signs indicating a gas station is nearby; (2) defendants' Camry had a quarter of a tank of gas left; and (3) defendants evidently had passed a gas station just 27 miles ago.

Trooper Ranieri also found it suspicious that neither defendant owned the car that they occupied. They said that they had borrowed the car from a friend to drive the friend's niece to Albuquerque. Trooper Ranieri saw little luggage in the car and noticed a strong smell of air freshener. Furthermore, he found it suspicious that the car had been insured just recently. All of these factors can contribute to reasonable suspicion. *See United States v. Wisniewski*, 192 F. App'x 749, 755 (10th Cir. 2006) ("Factors which are not proof of any illegal conduct and which are consistent with innocent travel may also contribute to a reasonable suspicion . . . . . Such factors may include the absence of luggage, ownership of the vehicle by a third party, an odor of air freshener, and implausible travel plans."). Trooper Ranieri also observed that defendants were unusually nervous and mentioned this to Trooper Stahl during the stop. Nervousness can contribute to reasonable suspicion. *United States v. Williams*, 271 F.3d 1262, 1269 (10th Cir. 2001) ("While we do recognize that nervousness alone cannot support reasonable suspicion of criminal activity, . . . we see no reason in this case to ignore [the defendant's] nervousness in reviewing the totality of the circumstances.") (citations and quotation marks omitted).

Based on these facts, all of which he learned during his initial two-minute conversation with defendants, the Court concludes that Trooper Ranieri had developed a "particularized and objective basis for suspecting legal wrongdoing." *Marquez-Diaz*, 325 F. App'x at 644.[1] The Court thus rejects defendants' argument that Trooper Ranieri unreasonably prolonged the traffic

---

[1] This suspicion was bolstered further when the dispatch operator informed the troopers that both defendants had a criminal drug history. *See Santos*, 403 F.3d at 1132 (noting that "in conjunction with other factors, criminal history contributes powerfully to the reasonable suspicion calculus").

9

stop for another, alternative reason: He had reasonable suspicion that defendants were involved in illegal activity after his initial conversation with them.

### B. Was the Continued Detention Justified?

After Trooper Ranieri issued Mr. Lopez a warning and returned defendants' driver's licenses, he said, "Hey guys, thank you," and both he and Trooper Stahl took a step away from the car. He then turned around and asked whether defendants had any "illegal guns or drugs in the back seat." He also asked to search the "back seat, inside of the car." After some discussion, defendants got out of the vehicle, and the troopers searched the back seat of the Camry.

"An officer may detain a motorist for questioning unrelated to the initial traffic stop if he has an objectively reasonable and articulable suspicion that illegal activity has occurred, or the driver voluntarily consents to further questioning." *United States v. Williams*, 403 F.3d 1203, 1206 (10th Cir. 2005). Defendants argue that the discussion after Trooper Ranieri issued the warning citation was not consensual and was therefore an unlawful detention that exceeded the scope of the initial stop. The Court rejects defendants' argument for two reasons. First, as discussed above, Trooper Ranieri had reasonable suspicion that defendants were involved in illegal activity which alone justifies continued questioning. *See id.* Second, the Court concludes that the additional discussion was consensual.

"A traffic stop may become a consensual encounter, requiring no reasonable suspicion, if the officer returns the license and registration and asks questions without further constraining the driver by an overbearing show of authority." *United States v. Bradford*, 423 F.3d 1149, 1158 (10th Cir. 2005). "An unlawful detention occurs only when the driver has an objective reason to believe he or she is not free to end the conversation with the officer and proceed on his or her own way." *Id.* (quotation omitted). Nothing in the encounter between defendants and Trooper

10

Ranieri after he returned their driver's licenses gave defendants "an objective reason" to believe that they could not choose to end the conversation and leave. *Id.* Trooper Ranieri asked, in a neutral tone, whether he could look in the back seat of the Camry. While defendants were deciding, he used phrases like "you make the call," "if you don't have a problem [with it]," and "it's up to you." Thus, Trooper Ranieri repeatedly made it clear to defendants that they had the freedom to decide whether to answer more questions and consent to a search. Eventually, defendants exited their car and allowed the troopers to search the back seat. Thus, the Court concludes that defendants consented to stay for additional questioning after Trooper Ranieri returned their driver's licenses.

### C. Did the Search of the Car Exceed the Scope of the Consent?

After defendants got out of the Camry, both troopers began searching the back seat. As he was searching, Trooper Ranieri noticed some suspicious modifications on the car's exterior. They led him to suspect that it contained a hidden compartment. Specifically, Trooper Ranieri noticed that the heat shield in the exhaust tunnel had undercoating spray on it, that bolts were sticking out from the heat shield, that the exhaust pipe had been bent down to a non-factory position in the exhaust tunnel, and that new bolts had been attached to the exhaust muffler. Based on this discovery, Trooper Ranieri instructed defendants to follow him in their car to the Kansas Department of Transportation facility in Alma, Kansas. There, officers accessed the compartment and discovered methamphetamine and cocaine.

Defendants argue that the search of the hidden compartment was illegal because it exceeded the scope of consent defendants provided. Defendants assert that they gave consent for the troopers to search only the back seat of the Camry. The Court need not address this issue, however, because Trooper Ranieri obtained probable cause to search the entire vehicle when he

11

noticed evidence of the hidden compartment.  "If there is probable cause to believe a vehicle contains evidence of criminal activity, *United States v. Ross,* 456 U.S. 798, 820-821 [] (1982), authorizes a search of any area of the vehicle in which the evidence might be found." *Arizona v. Gant*, 556 U.S. 332, 347 (2009).  "[V]isual evidence of a hidden compartment, without more, may provide probable cause to conduct or expand a search." *United States v. Ledesma*, 447 F.3d 1307, 1317 (10th Cir. 2006).  Here, Trooper Ranieri observed the suspicious modifications to the car, which itself provided probable cause to expand the search.  This conclusion is bolstered by other facts in this case:  defendants had exited the highway onto an unlit dirt road just after they passed ruse drug checkpoint signs.  The Court concludes that the scope of defendants' consent is immaterial because the troopers already had developed independent probable cause to search the entire car.

### III. Conclusion

The Court denies defendants' motion to suppress.  Trooper Ranieri had reasonable suspicion to stop defendants' car for violating K.S.A. § 8-1528.  He did not prolong the initial stop beyond the duration necessary to issue a warning citation.  Also, Trooper Ranieri could have extended the detention because he had reasonable suspicion that defendants were engaged in illegal activity.  After Trooper Ranieri issued the warning citation, defendants consented to stay for additional questioning.  Finally, Trooper Ranieri obtained probable cause to search the entire vehicle when he observed suspicious modifications on the exterior of the car that suggested a hidden compartment.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants' Joint Motion to Suppress Evidence (Doc. 32) is denied.

**IT IS SO ORDERED.**

**Dated this 16th day of July, 2015, at Topeka, Kansas.**

                                                    **s/ Daniel D. Crabtree**
                                                    **Daniel D. Crabtree**
                                                    **United States District Judge**